JACOB H. ZAMANSKY *(pending Pro Hac Vice)*
SAMUEL E. BONDEROFF *(pending Pro Hac Vice)*
EDWARD H. GLENN JR. *(pending Pro Hac Vice)*
ZAMANSKY LLC
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: 212/742-1414
Facsimile:  212/742-1177

*Counsel for Plaintiff*

MICHAEL L. KIRBY (CA SBN 50895)
RYAN S. KIRBY (CA SBN 252674)
KIRBY NOONAN LANCE & HOGE LLP
350 Tenth Avenue, Suite 1300
San Diego, CA 92101-8700
Telephone:  619/231-8666
Facsimile:   619/231-9593

*Local Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASSANDRA WILSON, and all other individuals similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EDISON INTERNATIONAL, INC., THEODORE F. CRAVER JR., and ROBERT BOADA,<br><br>Defendants. | Case No. _____<br><br><br>**COMPLAINT**<br><br><br><u>JURY TRIAL DEMANDED</u> |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
## <u>EMPLOYEE RETIREMENT INCOME SECURITY ACT</u>

Plaintiff Cassandra Wilson ("Plaintiff"), by and through her attorneys, files

this Complaint on behalf of herself and other similarly situated current and former

employees of Edison International Inc. ("Edison" or the "Company"), or its predecessor companies, who were participants in and beneficiaries of the Edison 401(k) Savings Plan (the "Plan") and who were invested in the Edison International Stock Fund (the "Stock Fund") during the period of March 27, 2014, through June 24, 2015, inclusive (the "Class Period"). She alleges the following based on the investigation of her counsel, which included a review of the Plan's governing documents; the Plan's annual reports filed with the United States Securities and Exchange Commission ("SEC") and U.S. Department of Labor ("DOL"); discussions with Plan participants; other SEC filings by Edison; other related lawsuits against Edison; the California Public Utilities Commission ("CPUC") Order Instituting Investigation ("OII") proceeding relating to the San Onofre Nuclear Generating Station ("SONGS"); press releases and other public statements issued by Edison; and media reports about Edison. Plaintiff is informed and believes that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

1.     This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, on behalf of participants in the Plan who purchased or held shares of the Stock Fund, against defendants, fiduciaries of the Plan, to recover many millions of dollars of damage suffered in their retirement accounts due to breaches of fiduciary duties owed to them. These defendants, who owed "the highest duty known to the law" to Plan participants, breached those duties throughout the Class Period after learning that Edison's stock price had become artificially inflated in value, and therefore had become an imprudent investment for employees' retirement savings; despite this knowledge, however, defendants took no action whatsoever to protect Plan participants from the harm this artificial inflation would inevitably cause.

2.     Defendant Edison, through its subsidiaries, generates and distributes electrical power and invests in energy services and technologies.  Southern California Edison ("SCE"), Edison's largest subsidiary, is one of the largest utilities in the United States, serving nearly 14 million people in California.  SCE is regulated by the CPUC and by the Federal Energy Regulatory Commission ("FERC").

3.     Edison, through SCE, was at all relevant times the operator and majority owner of SONGS, a now-inoperative nuclear power plant in Southern California.  In January 2012, Edison permanently shut down two SONGS reactor units for maintenance due to a leak that occurred in one of the heat transfer tubes. Although the units never returned to service, Edison continued to bill SCE customers tens of millions of dollars in rates each month to support these defunct units and to buy replacement power.

4.     In the aftermath of the shutdown, on October 25, 2012, the CPUC issued the OII to examine:  (i) the causes of the SONGS outages; (ii) the Company's responses thereto; (iii) the future of the SONGS unit; and (iv) the resulting effects on the provision of safe and reliable electric service at just and reasonable rates. Several consumer advocacy groups representing the interests of California public utility ratepayers also participated in the SONGS OII proceedings.

5.     On March 27, 2014, after settlement talks, Edison announced that it had reached a proposed $3.3 billion settlement of the SONGS OII proceeding (the "SONGS Settlement"), pursuant to which, among other terms, Edison would refund customers and reduce rates in compensation for the excess charges those customers had incurred after the SONGS units were taken offline. Several environmental and consumer advocacy groups were parties to the settlement, including the Utility Reform Network ("TURN").  The settlement was subject to CPUC approval.

6.     Edison's stock price appreciated substantially after the SONGS Settlement was announced, rising in a week from $49 per share to $54 per share.

7.     On November 20, 2014, the CPUC entered a decision approving the SONGS Settlement.  The decision determined that Edison, as one of the settling parties, had presented the settlement as a fair compromise of contested issues and that it was the result of "hard fought" negotiations in which Edison "compromised substantially" from positions taken throughout the OII proceeding.

8.     On February 9, 2015, however, SCE submitted a notice to the CPUC disclosing that a previously unreported *ex parte* contact between Stephen Pickett ("Pickett"), then an executive vice president at SCE, and Michael Peevey ("Peevey"), then-president of the CPUC, had occurred at an industry conference on March 26, 2013.  Pursuant to the CPUC's rules, the Company's failure to timely report the *ex parte* meeting between Pickett and Peevey represented a possible violation of CPUC rules governing *ex parte* contact between CPUC decision-makers and interested parties.

9.     In fact, Pickett and Peevey had extensive, substantive discussions concerning the framework of a SONGS settlement that would be most advantageous to the Company.  When a search warrant was executed on Peevey's home in January 2015, investigators discovered several pages of notes from the March 26, 2013 meeting that were written by Pickett and contained annotations by Peevey.

10.     Prompted by SCE's belated disclosure, the CPUC ordered SCE to turn over additional communications regarding the SONGS Settlement's negotiation.  On April 29, 2015, SCE duly complied and produced voluminous documents reflecting extensive *ex parte* communications that had occurred between Edison and CPUC. These *ex parte* communications demonstrated the knowledge and involvement of Edison's most senior officers, including the Company's Chief Executive Officer ("CEO") Theodore F. Craver Jr. ("Craver") – a defendant in this case – along with the Company's Chief Financial Officer ("CFO") and General Counsel ("GC"), as well as several members of Edison's Board of Directors.

11.     The disclosure of these *ex parte* communications by the Company sent the consumer advocacy groups that were parties to the SONGS Settlement into an uproar.  These groups have requested that the CPUC impose sanctions on the Company, impose a ban on all communication between the Company and the CPUC regarding SONGS, and modify or reopen the SONGS investigation and settlement. These consumer advocacy groups assert that the Company's failure to timely and completely disclose its *ex parte* communications with the CPUC constituted fraud and resulted in a settlement agreement on materially different terms than those that would have been agreed to had the *ex parte* communications been properly disclosed. Consequently, the SONGS Settlement is in jeopardy, and Edison could now be required to pay hundreds of millions of dollars more.

12.     On May 4, 2015, an article published by *SFGate* reported that SCE's newly released documents reflected a previously unreported May 2014 meeting between Peevey and SCE executives during which the parties discussed donating millions of dollars to a UCLA institute where Peevey held an advisory post.  On news of the additional *ex parte* communications, shares of Edison declined $2.87 per share over two days of trading, or roughly 3.75%, to close at $59.60 on May 6, 2015.

13.     On June 24, 2015, TURN filed an application with the CPUC that charged SCE with "fraud by concealment" and urged the CPUC to set aside the SONGS Settlement and reopen its investigation. This revelation proved to be the final nail in the coffin – shares of Edison declined $1.56 per share, or over 2.70%, to close at $56.07 – ultimately leading to findings by an Administrative Law Judge ("ALJ") that Edison had violated multiple rules and a fine of $16.7 million was imposed for its misconduct.

14.     In addition, Edison is currently under investigation by the State of California Department of Justice – Office of the Attorney General ("California Attorney General") as a result of, among other things, the *ex parte* communications

as described above.  On or about July 6, 2015, the California Attorney General executed multiple search warrants against the Company, including at its headquarters outside Los Angeles, and warrants on the CPUC's headquarters as well.  These most recent warrants seek, among other things, email correspondence involving at least two dozen people throughout both organizations.  People in the highest ranks of leadership at both Edison and the CPUC – including, upon information and belief, defendant CEO Craver, are included in these warrants.

15.    In short, Edison, through its senior officers, engaged in unlawful conduct that has jeopardized a multi-billion dollar regulatory proceeding settlement and exposed the Company to hundreds of millions of dollars in additional liability. Edison attempted to manipulate the outcome of the SONGS Settlement through improper *ex parte* interactions with the CPUC's decision-makers and senior-most personnel.  Edison failed to disclose the extent and substances of its *ex parte* communications although it was required to do so, and misrepresented the status of the SONGS Settlement proceedings to the public.  These wrongful acts and omissions cause the price of Edison stock to trade at artificially inflated levels throughout the Class Period.

16.    The Plan is a defined contribution plan sponsored by Edison for eligible employees of the Company.  Among the investment options available to Plan participants is the Stock Fund, which invests primarily in Edison stock.  The Plan, like any ERISA plan, had fiduciaries – people who were charged with monitoring and overseeing the Plan's investments, including the Stock Fund, communicating with Plan participants regarding these investments, and ensuring that those Plan participants' retirement savings were preserved and protected.

17.    The fiduciaries of the Plan include the defendants in this case. Defendants were required to ensure that each Plan investment option remained prudent, including the Stock Fund, based on what they knew or should have known at the time.

18. In this case, defendants knew or should have known that the Stock Fund – invested primarily in Edison stock trading at artificially high prices – had become imprudent during the Class Period. Extensive and illegal *ex parte* communications between Edison senior officials and the CPUC had taken place, distorting the legitimacy of the SONGS Settlement, yet were undisclosed in contravention of the law – a material fact that, once discovered, now jeopardizes the status of the SONGS Settlement, and the value of Edison stock.

19. Defendant Robert Boada, Edison's Vice President and Treasurer, is a member of the Trust Investment Committee and therefore is a "named fiduciary" of the Plan. At the time, Boada knew or should have known of the improper *ex parte* communications taking place regarding negotiations of the SONGS Settlement. Upon information and belief, Boada received weekly updates on the SONGS Settlement via internal emails he received and conferences in which he participated. He knew or should have known that the Company's *ex parte* communications were not disclosed and were, therefore, illegal, and that Edison's failure to disclose this illegal conduct was enabling its stock to trade at an artificially high value, thereby making the Stock Fund an imprudent investment for Plan participants.

20. Defendant CEO Craver also served as a Plan fiduciary; per the Plan, he was responsible for appointing and overseeing the Trust Investment Committee and other designated Plan fiduciaries. He was also directly involved in, and therefore well aware of, the illegal *ex parte* communications. As a monitoring fiduciary, Craver had a duty to ensure that the Plan fiduciaries whom he appointed knew all material information relating to Edison's stock, including what he knew about the *ex parte* communications and their potential impact on the SONGS Settlement, the concealment of which had artificially inflated Edison's stock and rendered the Stock Fund an imprudent investment, so that those other Plan fiduciaries could properly do their job of protecting Plan participants from the harm caused by an imprudent investment. In addition, as CEO of Edison and a Sarbanes-Oxley signatory of

Edison's published financial statements and filings, Craver was ideally positioned to correct the very artificial inflation that had made the Stock Fund an imprudent investment to begin with – thereby complying with his duties under the federal securities laws *and* ERISA simultaneously.

21.     Defendant Edison, endowed by the Plan with the power to amend it, was a *de facto* fiduciary and therefore was obliged to take steps to protect Plan participants from harm.  Edison could have amended the Plan to freeze the Stock Fund from new investment until the Company's stock was trading at corrected levels; more important, Edison could have made the timely and truthful disclosures that would have eliminated the artificial inflation altogether.

22.     In sum, Defendants knew or should have known that Edison was engaged in extensive *ex parte* communications to manipulate the SONGS Settlement, and that this conduct put at risk the announced SONGS Settlement.  The SONGS Settlement had enormous public and political interest, and any public report that it was unfair to the public or had been negotiated through improper back-channel *ex parte* communications would cause a huge backlash.  Thus, defendants knew or should have known that the concealment of this information was causing Edison's stock price to be artificially inflated, and the stock price would correct when the public learned the truth.  This artificial inflation, in turn, made the Stock Fund, which primarily held Edison stock, an imprudent investment for as long as the inflation continued.  Defendants were obligated, as fiduciaries, to take action to protect Plan participants from the harm of this imprudent investment.

23.     Any Plan participant who purchased shares of the Company Stock Fund during the time when the stock was artificially inflated was buying it at a falsely high price.  When the fraud was inevitably revealed, and the stock price returned to a level that actually reflected its value, those purchasers suffered considerable losses and were damaged as a result.  Even if the stock price were to

recover at some point down the road, those purchasers would miss out on some measure of gains because their purchase price had been artificially high.

24.     Plan participants who simply held shares of the Stock Fund during the Class Period were damaged as well, because they held an imprudent investment during a time when (had they known the truth) they could have shifted their holdings into a different, prudent investment trading at an accurate value, and thus their damages constitute the difference between the performance of that other prudent investment and the imprudent one they actually held.

25.     Defendants should have recognized that Edison's artificially inflated stock would ultimately result in the aforementioned injuries to Plan participants. And once they recognized that fact, they should have taken immediate action to prevent, or at least mitigate, those injuries.

26.     Defendants could have taken at least two actions to fulfill their fiduciary duty.  First, they could have acted promptly to correct the artificial inflation of the Company's stock, which, in turn, would have made the Stock Fund once again a prudent investment. In other words, defendants simply could have told the public the truth.  CEO Craver, as well as Edison itself, was obviously in a perfect position to accomplish this task; defendant Boada, who as Treasurer would have been heavily involved in the Company's financial reporting, was well-situated to do so as well.

27.     Disclosure of this kind would have been consistent with defendants' obligations under ERISA as fiduciaries, and also with the Company's obligations under the federal securities laws – which, after all, require publicly-traded companies to be truthful and accurate in their financial reporting.

28.     Defendants cannot excuse their failure to tell the truth by claiming that, at the time, they could reasonably thought it would have done more harm than good to do so.  Even if disclosing the truth about a fraud is likely to have a negative impact on a company's stock price, that negative impact will only get worse the

longer the fraud goes on.  Indeed, that negative impact would be nothing more than the returning of the stock price to its correct, non-artificially-inflated levels.  Neither ERISA nor the securities laws permit the ongoing sanctioning of fraud under any circumstances.

29.     Defendant Edison could have taken other actions to protect Plan participants as well.  The Company had the power to amend the Plan itself at any time, and thus could have amended the Plan to suspend new investments in the Stock Fund, or even remove the Stock Fund as an investment option altogether, until such time as the fund was no longer imprudent.

30.     In addition, defendant Craver could have, and should have, in his capacity as a monitoring fiduciary, informed his co-fiduciaries of what he knew about the Company's misconduct, and the concealment of that misconduct from the public, thus enabling those co-fiduciaries to take prophylactic action to protect Plan participants from further harm that this artificial inflation was causing.  For example, if Craver had told the members of the Trust Investment Committee about the artificial inflation of Edison's stock, and, therefore, the imprudence of the Stock Fund as a Plan investment, the Committee could have directed the Plan Trustee to close the Stock Fund to new investment until the artificial inflation was corrected.  Defendant Boada, as a member of the Trust Investment Committee, could have revealed what he knew to his co-Committee members to accomplish the same end.

31.     Preventing new investment in the Stock Fund would not constitute insider trading under the securities laws.  To the extent it triggered some disclosure obligation of the Company, such disclosure would be a good thing considering that disclosure of the truth was the other option defendants could have exercised to protect Plan participants from the harm of the Company's artificially inflated stock price.

32.     Instead, defendants allowed their employee Plan participants to whom they owed their fiduciary duties to purchase and hold an imprudent investment

1   throughout the Class Period without taking action to protect them in any way.

2   Edison's stock price went from $49 per share to over $66 per share, and then

3   dropped 15% as the truth began to emerge.  Defendants are directly responsible as

4   fiduciaries for this considerable harm that their breaches of their duties caused

5   during the Class Period.

## I.      JURISDICTION AND VENUE

7        33.     This Court has subject matter jurisdiction over this action pursuant to

8   28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9        34.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29

10  U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all

11  of the fiduciary breaches for which relief is sought occurred in this district, and

12  defendant Edison maintains its primary place of business in this district.

## II.      THE PARTIES

14       35.     Plaintiff Cassandra Wilson is a Plan participant within the meaning of

15  ERISA § 3(7), 29 U.S.C. § 1102(7). She is an employee of Edison who was and

16  continues to be a participant in the Plan.  She purchased and held shares of the Stock

17  Fund in her Plan retirement savings account during the Class Period.

18       36.     Defendant Edison is based in Rosemead, California, and, at relevant

19  times, is and was the sponsor of the Plan within the meaning of ERISA § 3(16)(B),

20  29 U.S.C. § 1002(16)(B).  Additionally, Edison was a *de facto* fiduciary of the Plan

21  pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had

22  discretionary authority and control regarding the management of the Plan and the

23  Plan's assets.  Edison has approximately 326 million shares of stock issued, and

24  trades on the NYSE under the ticker symbol "EIX."

25       37.     At all times, defendant Craver is and was the CEO of Edison, and a

26  fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)

27  because he had discretionary authority and control over appointing the persons

28  responsible for the management of the Plan and the Plan's assets.

38.     At all times, defendant Boada is and was the Vice President and Treasurer of Edison and a member of the Edison 401(k) Savings Plan Trust Investment Committee, and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

### III.     THE PLAN AND ITS FIDUCIARIES

39.     The Plan is a defined contribution benefit plan that is sponsored by Edison for eligible employees and is subject to ERISA.  Employees can elect to defer up to 84% of their compensation into the Plan, and Edison will generally make a matching contribution for some employees of 6%.  A Plan participant contributes into an individual retirement account and can invest his or her contributions into various specified investment options.

40.     Section 19.02 identifies the "Benefits Committee and its members and the Trust Investment Committee and its members" as the "named fiduciaries" of the Plan.  Both committees are appointed from time to time by CEO Craver, who has a responsibility to oversee and monitor his appointments.  Among the members of the Trust Investment Committee is defendant Boada.

41.     Section 25.01 of the Plan gives the Trust Investment Committee the power and authority to select all funds which are investment options under the Plan, and to make changes to the funds offered as investment options.  Specifically, it states "the Trust Investment Committee may direct the Trustee to add establish Investment Funds or discontinue existing ones, as well as change the investment medium for each Fund."  In short, the Plan gives the Trust Investment Committee wide-ranging discretion over the investment options under the Plan.

42.     Under Section 19.01, the Benefits Committee is designated as the Plan Administrator and has the power to amend the Plan as appropriate for the fulfillment of its administrative duties.  Specifically, the Benefits Committee is empowered to "make such rules, regulations and decisions as it deems necessary for the uniform,

non-discriminatory and efficient administration of the Plan."  Moreover, pursuant to the Trust Agreement between the Plan and State Street, the Plan Trustee and holder of the Plan's assets, the Benefits Committee is responsible for determining the Stock Fund's permissibility under ERISA Sections 406 and 407.

43.   Section 22.02 of the Plan establishes the right of Edison to amend the Plan at any time.  This amendment power includes the power to close the Stock Fund to new investments or to eliminate it as an investment option altogether.

44.   Thus, if investment in the Company Stock Fund contravenes applicable law – like if it becomes imprudent under ERISA – the Benefits and Trust Investment Committees, along with the Company itself, are empowered to take necessary action to protect Plan participants, including temporarily closing the Stock Fund until such time as it becomes a prudent investment again.

45.   Based on these Plan provisions, throughout the Class Period, defendants had the power and authority to take action to cease offering the Stock Fund under the Plan, if necessary, to achieve compliance with ERISA or to correct any breaches of fiduciary duty toward Plan participants.  These defendants could have used their authority over the Trustee to close the Stock Fund to new investments while Edison's stock price remained artificially inflated and therefore imprudent.  The Company could have amended the Plan itself to accomplish this same end.

46.   Defendants also could have effectuated disclosure of the truth to the public in order to correct the artificial inflation that had given rise to the Stock Fund's imprudence in the first place.  Edison and CEO Craver's ability to make those corrective disclosures is obvious; defendant Boada, as Treasurer and, upon information and belief, in a direct reporting line to the CFO of the Company (a Sarbanes-Oxley signatory like CEO Craver), could have done so as well.  Such disclosure would have consistent with, and, indeed, required by, the federal securities laws and ERISA.

47.     CEO Craver, as an appointing and monitoring fiduciary, was obliged to provide accurate information to those fiduciaries he was responsible for monitoring, including the members of the Trust Investment Committee and the Benefits Committee.  Therefore, he could have communicated what he knew (or should have known) regarding the imprudence of the Stock Fund and the reasons for it to those co-fiduciaries so that they could have acted to freeze or close the Stock Fund or otherwise act to protect Plan participants.  Boada could have done the same to his co-fiduciaries on the Trust Investment Committee – or to the members of the Benefits Committee, for that matter.  Instead, however, defendants did nothing.

## IV.    EDISON'S FRAUD MADE ITS STOCK IMPRUDENT

### *Background and the SONGS OII Settlement*

48.     Defendant Edison, through its subsidiaries, generates and distributes electrical power and invests in energy services and technologies.  SCE, Edison's largest subsidiary, is one of the largest utilities in the United States, serving nearly 14 million people in Central, Coastal and Southern California.  SCE is regulated by the CPUC and by FERC.

49.     The Company was founded in 1987 and is incorporated in California, with headquarters in Rosemead, California. Its shares trade on the NYSE under the ticker symbol "EIX."

50.     SONGS is a retired nuclear power plant located in south San Clemente, California. The Company owns a 78% stake in SONGS and San Diego Gas & Electric ("SDG&E") owns a 20% interest in the facility. SONGS contains three units: Units 1, 2, and 3.  In 2006, Edison advised the United States Nuclear Regulatory Commission ("NRC") of its intention to replace the steam generators for Units 2 and 3.  The replacement steam generators at Units 2 and 3 were put into operation in January 2010 and February 2011, respectively, and SONGS returned to commercial operation in February 2011.

51.     In early 2012, failures relating to the replacement steam generators at Units 2 and 3 were discovered.  These failures ultimately rendered SONGS permanently inoperable in June 2013.

52.     On March 19, 2012, the NRC dispatched an inspection team to gather facts regarding the SONGS failures.  The NRC's investigation culminated in a report that found, among other things, design flaws in the replacement steam generators at SONGS.

53.     The SONGS outages resulted in the filing of several rate setting proceedings before the CPUC by and between various consumer advocacy groups, SCE, SDG&E, Mitsubishi (the manufacturer of the failed replacement steam generators), and insurance carriers.  Among the issues presented in these proceedings was the proper allocation of the costs associated with the SONGS failure between the public utility companies and California ratepayers.

54.     On October 25, 2012, the CPUC issued the OII and commenced an investigation into SCE's role in the SONGS outage.  The stated purposes of the OII were to investigate: (i) the causes of the SONGS outages; (ii) the Company's responses thereto; (iii) the future of the SONGS unit; and (iv) the resulting effects on the provision of safe and reliable electric service at just and reasonable rates. The OII was issued by, among other people, then-President of the CPUC Michael Peevey and then-Commissioner of the CPUC Michael Florio ("Florio").  The OII also consolidated the various rate setting proceedings into a single matter.  The OII encompassed SCE, SDG&E, the Officer of Ratepayer Advocates ("ORA"), TURN and the Alliance for Nuclear Responsibility ("ANR").

55.     On April 3, 2014, SCE, SDG&E, TURN, ORA, and other related parties filed a joint motion for adoption of a settlement agreement that, if approved, would resolve all issues involved in the OII proceedings.  All interested parties, however, did not agree to the settlement, and as such, commentary on, and objections to, the settlement were lodged in the OII proceedings.

56.     On September 5, 2014, the CPUC issued an Assigned Commissioner and Administrative Law Judges' Ruling Requesting Settling Parties to Adopt Modifications to Proposed Settlement Agreement (the "Request to Adopt Modifications").  The Request to Adopt Modifications was issued by Commissioner Florio and ALJs Melanie M.  Darling ("ALJ Darling") and Kevin R. Dudney ("ALJ Dudney").  Notably, the Request to Adopt Modifications asked the settling parties to:

> [A]dd a provision which will result in a multi-year project, undertaken by the University of California (or a UC-affiliated entity), funded by shareholder dollars, to spur immediate practical, technical development of devices and methodologies to reduce emissions at existing and future California power plants tasked to replace the lost SONGS generation. Specifically, the Request to Adopt Modification provided that SCE would donate $4 million annually, for a period of up to five years, with all such donations deriving from shareholder funds.  The foregoing project is hereinafter referred to as the "Greenhouse Gas Initiative."

57.     On September 19, 2014, the settling parties filed responses to the Request to Adopt Modifications acknowledging that the settling parties intended to accept the CPUC's proposed modifications to the settlement agreement, including the Greenhouse Gas Initiative.  Accordingly, on September 24, 2014, the settling parties submitted an amended settlement agreement in compliance with the Request to Adopt Modifications.

58.     On November 20, 2014, the CPUC approved the amended settlement agreement.  The primary terms of the settlement provided for ratepayers to pay approximately $3.3 billion in costs that included, *inter alia*, those costs attributable to replacement power purchased by the utility companies for ratepayers in the aftermath of the SONGS outage and the recovery of certain underappreciated net investments in SONGS assets, such as the base plant located at the facility.  The settlement also provided that the public utilities would, *inter alia*, provide ratepayer refunds and credits of approximately $1.45 billion.  The settlement further provided for the creation of the Greenhouse Gas Initiative which would run for a term of five years and be funded by SCE in the amount of $4 million annually.

59.     The November 20, 2014 decision found that SCE, as one of the settling parties, presented the settlement as a fair compromise of contested issues which was the result of "hard fought" negotiations in which it "compromised substantially" from positions taken throughout the OII proceeding.  This representation was later revealed to be untrue, when it was revealed that Edison, through its senior officers, engaged in and knowingly permitted unlawful conduct to manipulate the outcome of the SONGS Settlement through improper extensive *ex parte* interactions with CPUC decision-makers and personnel for over a year.

### *Edison's False and Misleading Statements*

60.     During the Class Period, Edison filed quarterly reports on Form 10-Q with the SEC announcing its financial and operating results.  In its Form 10-Q filings, Edison made false and misleading descriptions about the status of the SONGS Settlement.

61.     For example, in its Form 10-Q for Q2 2014 filed with the SEC dated July 31, 2014, the Company stated, in part, that:

> In October 2012, the CPUC issued an Order Instituting Investigation ("OII") that  consolidated all San Onofre issues in related CPUC regulatory proceedings to consider appropriate cost recovery for all San Onofre costs, including among other costs, the cost of the steam generator replacement project, substitute market power costs, capital expenditures, and operation and maintenance costs.

> On March 27, 2014, SCE entered into a settlement agreement (the "San Onofre OII Settlement Agreement") with The Utility Reform Network ("TURN"), the CPUC's Office of Ratepayer Advocates ("ORA") and SDG&E, which was later joined by the Coalition of California Utility Employees ("CUE") and Friends of the Earth ("FOE") (together, the "Settling Parties").  If implemented, the San Onofre OII Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre.  The San Onofre OII Settlement Agreement does not affect proceedings before the NRC or proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries. Implementation of the San Onofre OII Settlement Agreement is subject to the approval of the CPUC.  The parties to the San Onofre OII Settlement Agreement have agreed to exercise their best efforts to obtain CPUC approval.  The San Onofre OII Settlement Agreement is subject to termination by any of the Settling Parties if the

CPUC has not approved it within six months of submission, but there can be no certainty of when or what the CPUC will actually decide.. .

On April 3, 2014, the Settling Parties filed a motion in the OII requesting the CPUC to approve the San Onofre OII Settlement Agreement without change, find the Settlement Agreement reasonable and expedite consideration of the San Onofre OII Settlement Agreement in order to provide the benefits of it as soon as possible. . . . The Settling Parties further agree to review any CPUC orders regarding the San Onofre OII Settlement Agreement to determine if the CPUC has changed or modified it, deleted a term or imposed a new term. If any Settling Party is unwilling to accept any such change, modification, deletion or addition of a new term, then the Settling Parties will negotiate in good faith to seek a resolution acceptable to all Settling Parties. If they are unable to resolve the matter to the satisfaction of all Settling Parties or to obtain prompt CPUC approval of an agreed upon resolution, then any Settling Party can terminate the Settlement Agreement upon prompt notice. Under CPUC rules, parties in the OII have had an opportunity to comment on the San Onofre OII Settlement Agreement, and the CPUC held an evidentiary hearing on May 14, 2014 and a public participation meeting on June 16, 2014, at which various intervenors who were not Settling Parties opposed the proposed settlement and others supported it. Following conclusion of the public participation meeting, approval of the San Onofre OII Settlement Agreement was submitted to an Administrative Law Judge to render a proposed decision for further consideration by the CPUC. CPUC rules do not provide for any fixed time period for the CPUC to act on the San Onofre OII Settlement Agreement. Pursuant to the CPUC's rules, no settlement becomes binding on the parties to it unless the CPUC approves the settlement based on a finding that it is reasonable in light of the whole record, consistent with law, and in the public interest. The CPUC has discretion to approve or disapprove a settlement, or to condition its approval on changes to the settlement, which the parties may accept or reject.

62.    In its Form 10-Q for Q3 2014 filed with SEC dated October 28, 2014, Edison stated, in part, that:

In October 2012, the CPUC issued an Order Instituting Investigation ("OII") that consolidated all San Onofre issues in related CPUC regulatory proceedings to consider appropriate cost recovery for all San Onofre costs, including among other costs, the cost of the steam generator replacement project, substitute market power costs, capital expenditures, and operation and maintenance costs. On September 23, 2014, SCE entered into an Amended and Restated Settlement Agreement (the "San Onofre OII Amended Settlement Agreement") with The Utility Reform Network ("TURN"), the CPUC's Office of Ratepayer Advocates ("ORA"), SDG&E, the Coalition of California Utility Employees ("CUE"), and Friends of the Earth ("FOE") (together, the "Settling Parties"). If implemented, the San Onofre OII Amended Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the

related outage and subsequent shutdown of San Onofre.  The Settling Parties agreed to amend the Settlement Agreement that was originally entered into in March 2014 in response to an Assigned Commissioner's and Administrative Judges' Ruling that was issued on September 5, 2014.  The San Onofre OII Amended Settlement Agreement . . .describes how shareholders and customers will share any potential recoveries.  Implementation of the San Onofre OII Amended Settlement Agreement is subject to the approval of the CPUC.  The San Onofre OII Amended Settlement Agreement is subject to termination by any of the Settling Parties if the CPUC has not approved it by December 23, 2014.  On October 9, 2014, the Administrative Law Judges in the OII issued a Proposed Decision approving the San Onofre OII Amended Settlement Agreement.  Under applicable rules, the CPUC cannot render a final decision for at least thirty days following the date of the Proposed Decision, but there can be no certainty of when or what the CPUC will actually decide.  The parties to the San Onofre OII Amended Settlement Agreement have agreed to exercise their best efforts to obtain CPUC approval.

63.     Edison's statements in its SEC filings were materially false and misleading and/or failed to disclose that: (i) Edison's *ex parte* contacts with CPUC decision makers were more extensive than the Company had reported to CPUC; (ii) that belated disclosure of Edison's *ex parte* contacts  with CPUC personnel would jeopardize the Company's $3.3 billion dollar SONGS Settlement; and (iii) as a result of the above, the Company's financial statements were  materially false and misleading at all relevant times.

### *Edison's First Disclosure of Ex Parte Communications*

64.     On February 9, 2015, for the first time, SCE submitted a notice to the CPUC disclosing that a previously unreported *ex parte* contact between Pickett, then an executive vice president at SCE, and Peevey, then president of the CPUC, had occurred at an industry conference on March 26, 2013 held in Poland.  At that time the SONGS Settlement negotiations were ongoing, and Pickett's and Peevey's conversation concerned the future of SONGS and a possible resolution of the CPUC's investigation.

65.     Proceedings before the CPUC are governed by, among other things, the Public Utilities Code (the "Code") and the CPUC's Rules of Practice and Procedure (the "Rules").  The Code and Rules provide specific directives regarding *ex parte*

communications in CPUC proceedings such as the SONGS OII.  Rule 8.1(c) generally defines an "*ex parte* communication" as a written or oral communication between an "interested person" and a CPUC "decision-maker" about an issue before the CPUC that is stated or provided outside the formal proceeding process.  A "decision-maker" can be, among other people, a CPUC Commissioner or an ALJ, and an "interested person" includes, among other people, parties in a CPUC proceeding.

66.    Additionally, the SONGS OII was a rate setting proceeding which is subject to the stringent reporting requirements of Rule 8.4, which requires that an interested person" report any *ex parte* communications "within three working days of the communication. . . ."

67.    On September 25, 2014, nearly two months prior to the November 20, 2014 settlement conference, Edison's Chief Ethics and Compliance Officer sent an email to Company personnel stating: "While we are well aware of the CPUC's *ex parte* communications rules, this situation makes clear that awareness of the rules is not enough."

68.    Edison's late filing of its notice on February 9, 2015 was highly significant.  The notice related to *ex parte* communications that took place on March 26, 2013 between Pickett and Peevey at a hotel in Warsaw, Poland (the "Warsaw Meeting").  The Warsaw Meeting took place more than two months *before* settlement negotiations commenced in the SONGS OII proceedings in mid- to late June 2013.  Pickett retired from the Company on November 30, 2013.

69.    Edison did not disclose the Warsaw Meeting until this February 9, 2015 filing.  This is notable because it was not made until after: (i) Peevey had resigned from the CPUC, effective December 31, 2014; (ii) the California Attorney General had seized handwritten notes from the Warsaw Meeting during a January 2015 raid on Peevey's home; and (iii) the Company had purportedly implemented its first *ex parte* communication policy on or around February 2, 2015.

70.     In the February 9, 2015 filing, Edison revealed that Pickett had recently provided the Company with further information about the Warsaw Meeting, which Pickett conceded "may have crossed into a substantive communication."  Edison further revealed that Pickett's notes from the Warsaw Meeting included a set of possible settlement terms, provided by Peevey, concerning how costs might be allocated if SONGS were to permanently shut down.  The Company also disclosed that Peevey retained the notes, which were presumably in the hands of the California Attorney General by the time of the February 9, 2015 Filing.

71.     The very next day, recognizing Edison's flagrant disregard for CPUC's *ex parte* communication rules, ANR filed a motion for sanctions against the Company in the SONGS OII proceeding.  The motion for sanctions read, in part:

> By failing to timely disclose the "approximately" 30-minute [Warsaw Meeting], at which SCE provided a status update on its SONGS Unit 2 restart efforts and responded to President Peevey's comments regarding an acceptable resolution to [the SONGS OII], SCE severely prejudiced [ANR] and all other parties to this proceeding.  Rule 8.3(c)(2) required that all other [SONGS OII] parties be afforded "an individual meeting of a substantially equal period of time" with President Peevey.

> The severity of this violation is self-evident: Unit 2 restart efforts were a core subject of Phase 1 of the Commission's investigation, and SCE now admits discussing "a framework for a possible resolution of the entire Order Instituting Investigation" with the Commission President nearly seven weeks before the Phase 1 evidentiary hearings even commenced.

72.     On February 24, 2015, Edison filed its Form 10-K with the SEC for its 4Q 2014 and fiscal year 2014.  The Form 10-K discloses in part:

> On February 9, 2015, SCE filed in the OII proceeding a Late-Filed Notice of *Ex Parte* Communication regarding a meeting in March 2013 between an SCE senior executive and the president of the CPUC, both of whom have since retired from their respective positions.  In response, the Alliance for Nuclear Responsibility, one of the intervenors in the OII, filed an application requesting that the CPUC institute an investigation into whether sanctions should be imposed on SCE in connection with the *ex parte* communication.  The application requests that the CPUC order SCE to produce all *ex parte* communications between SCE and the CPUC or its staff since January 31, 2012 and all internal SCE unprivileged communications that discuss such *ex parte* communications.

73.     Edison's statements remained false and materially misleading because they omitted any reference to the other extensive *ex parte* communications that were known to its senior officers at the time, as well as the significance and impact these instances of misconduct would inevitably have on the SONGS Settlement.

74.     Additionally, on April 10, 2015, the California Attorney General provided the CPUC with a two-page document containing the notes from the Warsaw Meeting.  The CPUC, in turn, produced the notes to the parties in the OII proceeding, and to other parties who had previously requested copies through the California Public Records Act.

***The Additional Ex Parte Communication Disclosures***

75.     On April 13, 2015 ALJ Darling and ALJ Dudney issued a ruling directing SCE to provide additional information relating to its late-filed notice of *ex parte* communications.  The ruling found that "[t]he Late-Filed *Ex Parte* Notice [filed by Edison on February 9, 2015] offered little information about the content of the meeting between Commission President Peevey and SCE's Executive Vice President" and directed SCE to provide the following additional information to the CPUC and the parties no later than April 29, 2015:  (a) documents pertaining to oral and written communications about potential settlement of the SONGS OII between any SCE employee and CPUC decision makers between March 1, 2013 and November 31, 2014; and (b) internal written communications which reported, discussed, referred to, or otherwise contained a description of oral or written communications about settlement with CPUC decision makers.  The ruling further directed SCE to file notices of any undisclosed communication identified in part (a) or any other oral or written *ex parte* communication relating to the substantial issues described in the OII proceedings.

76.     On April 17, 2015, ORA issued a press release titled, "ORA Director Joe Como Response to Conduct by Southern California Edison and Former CPUC

President Michael Peevey to Undermine the SONGS Settlement Process," which states in part:

> SAN FRANCISCO, April 17, 2015 – The Office of Ratepayer Advocates (ORA), the independent consumer advocate within the California Public Utilities Commission (CPUC) wants *at least $648 million* returned to customers of Southern California Edison Company (Edison) and San Diego Gas & Electric Company (SDG&E) because of recently revealed evidence of inappropriate conversations between former CPUC President Michael Peevey and Edison Executive Vice President Stephen Pickett.  These two individuals worked in secret to outline an acceptable financial settlement of the San Onofre Nuclear Generating  Station (SONGS) closure.  This back-channel deal between a regulator and the utility may have undermined the efforts of ORA and The Utility Reform Network (TURN) to negotiate the best deal for ratepayers.  ORA is outraged at the revelations regarding CPUC rule violations that occurred prior to the commencement of the SONGS settlement negotiations, and that Edison's actions have undermined the results of ORA's good faith negotiations to represent the best interests of ratepayers.  ORA looks forward to actively participating in any investigation to uncover further wrongdoing.
>
> On February 9, 2015, ORA first became aware of the discussion between Peevey and Pickett when Edison filed with the CPUC a 2-year late *ex parte* notice of the meeting that occurred in March 2013 in Warsaw, Poland.  On Friday April 10, 2015, we learned that the conversation outlined a framework for a SONGS settlement and was memorialized on hotel stationery (commonly referred to as the Hotel Bristol Notes).  ORA had not seen the Hotel Bristol Notes until they were publically released one week ago by the California Attorney General.
>
> * * *
>
> The process for fair dealings at the CPUC had been severely compromised.  But to simply invalidate the settlement and go back to the hearing room would essentially give Edison the opportunity to litigate for an outcome that may be worse than the settlement.  Edison should not be given a second bite at the apple.  But if the CPUC were to scrap the SONGS settlement, ORA is prepared to vigorously litigate for a better outcome.  Alternately ORA recommends, at a minimum, Edison be sanctioned and required to return to ratepayers an additional $648 million, which represents the difference between ORA's original litigation position and what the settlement provided.  Furthermore, as more information is developed  in the investigation that determines the extent to which Edison worked to mislead the CPUC by artifice or false statements, Edison should be further sanctioned.

77.     On April 27, 2015, ANR filed with the CPUC a petition seeking modification of the November 20, 2014 Decision.  The petition raised two fundamental arguments: "one concerning extrinsic fraud by SCE, which severely

1  prejudiced [ANR] (and other non-utility parties) and prevented it (and them) from

2  effective participation in the [SONGS OII proceeding]," and the other "concerning

3  SCE's fraud-by-concealment, which induced a legally defective settlement

4  agreement in [the SONGS OII proceeding]."

5  78.    According to ANR, "[t]he content of the [Warsaw Meeting] Notes, and

6  the failure of SCE to properly disclose the oral and written *ex parte* communications

7  memorialized by the Notes, constitute what the [CPUC] has previously

8  characterized as 'new facts or circumstances which create a strong expectation that

9  we would have made a different decision in a prior order.'" The petition states that,

10  had ANR been aware of the March 26, 2013 *ex parte* communications in Poland, it

11  would have contested numerous elements of the design and execution of the

12  SONGS investigation.

13  79.    On April 29, 2015, in response to ALJ Darling and ALJ Dudney's

14  April 14, 2015 ruling, the Company filed a production that included hundreds of

15  pages of previously undisclosed *ex parte* communications (the "April 29, 2015

16  Filing") implicating nearly all of Edison's most senior officers.  The production was

17  culled from emails of approximately 13 officers of Edison which were subjected to a

18  protocol of search terms.  Claimed privileged materials were withheld.

19  80.    In a declaration from Pickett that was included with the April 29, 2015

20  Filing (the "Pickett Declaration"), Edison revealed that as early as April 1, 2013,

21  Pickett had briefed senior Edison executives about the Warsaw Meeting. Those

22  senior executives included defendant CEO Craver, then-SCE President Ron

23  Litzinger ("Litzinger"), Edison CFO Jim Scilacci, and Edison then-GC Robert

24  Adler.

25  81.    After the briefing session, Pickett sent the senior executives an email

26  attaching a typed document, authored by Pickett, that summarized the Warsaw

27  Meeting. Pickett titled that document, rather tellingly, "Elements of a SONGS

28  Deal."  The Pickett Declaration stated that "Elements of a SONGS Deal" was

"intended to be an internal outline that could serve as a basis for discussing a potential settlement in a deal with consumer and other groups should SCE's efforts to restart SONGS prove unsuccessful."  The Pickett Declaration thus makes clear that knowledge of the Warsaw Meeting reached the highest levels of the Company's management as early as April 1, 2013 – and that defendant Craver was among those with this knowledge.

82.     Edison further disclosed that on June 6, 2013, defendant Craver sent an email describing two improper substantive *ex parte* contacts with Peevey to Edison directors Jagjeet Bindra, Richard Schlosberg, Peter Taylor, and Brett White. Accordingly, a majority of the Board had actual knowledge that high-ranking Edison personnel had repeatedly participated in improper *ex parte* communications with Peevey regarding the SONGS OII and had failed to disclose those communications as required by CPUC rules.

83.     Furthermore, the April 29, 2015 Filing also disclosed numerous *ex parte* communications between the Company and the CPUC regarding the Greenhouse Gas Initiative.  According to a declaration from Litzinger included with the April 29, 2015 Filing (the "Litzinger Declaration"), Litzinger attended a meeting with then-CPUC President Peevey and CPUC Commissioner Florio on May 2, 2014 wherein:

> Peevey stated he was pleased with the SONGS settlement. President Peevey stated that I probably knew he had talked to Mr. Pickett in Poland.  President Peevey waved a set of handwritten notes, but did not give me the notes to read . . . President Peevey told me that the settlement was missing a provision to address the greenhouse gas impacts of the SONGS retirement, and he asked SCE to make a voluntary contribution to the University of California ("UC"), specifically UCLA, for greenhouse gas research.  President Peevey stated the contribution should total $25 million over five years, with $4 million a year coming from SCE and $1 million a year coming from SDG&E.

84.     The Litzinger Declaration reveals several other interactions between the Company and the CPUC relating to the Greenhouse Gas Initiative that took

place throughout the duration of the SONGS OII negotiations.  Those interactions include, most notably, a June 17, 2014 meeting between Peevey and defendant Craver in which the Greenhouse Gas Initiative was discussed.

85.     The April 29, 2015 Filing sent the parties to the SONGS OII into an uproar that included: (i) a motion from ORA seeking an interim ban on communications between SCE and the CPUC; and (ii) an amended motion from ANR for sanctions; and (iii) a petition from ANR for modification of the settlement based upon the information contained in the April 29, 2015 Filing.

86.     After reviewing the additional SCE documents, TURN's attorney stated that the documents showed "a number of unreported *ex parte* contacts and that Edison violated the rules by not reporting those communications."

87.     On May 4, 2015, an article published by *SFGate* reported that SCE's newly released documents revealed a previously unreported May 2014 meeting between Peevey and SCE executives at which the parties discussed donating millions of dollars to a UCLA institute at which Peevey held an advisory post.

88.     On June 24, 2015, TURN filed an application with the CPUC that charged SCE with "fraud by concealment" and urged the CPUC to set aside the SONGS Settlement and reopen its investigation.  This action revealed the extent and depth of Edison's misconduct, and proved to be the genesis of the ALJ's findings that Edison had violated multiple rules and should pay a fine of $16.7 million for its misconduct.

### *The Results of TURN's Petition*

89.     On June 26, 2015, ALJ Darling issued an Email Ruling Requesting Supplemental Information From Southern California Edison By July 3, 2015.  The ruling directed SCE to produce additional information related to a number of previously undisclosed *ex parte* communication between January 2013 and June

2014, as well as certain items identified on its privilege logs.  Edison subsequently responded and filed a response with 43 additional documents.

90.   During the week of July 6, 2015, numerous media publications reported that the California Attorney General had issued and executed two search warrants, at least one of which involved a search of Edison headquarters, regarding arrangements made between former CPUC President Peevey and Edison.  The search warrants addressed to the Company generally sought:

> Any and all records from January 2012 until current, involving the [SONGS] close settlement agreement, the 2013 meeting between Stephen PICKETT and Michael PEEVEY in Poland, communication(s) pertaining to the determination of when and why SONGS would be closed, commitment of monies for research as a result of the closure of SONGS, and communication(s) pertaining to the settlement of the SONGS [OII].

91.   On August 5, 2015, the ALJ issued a ruling against Edison on TURN's application (as well as a motion by ANR along similar lines) (the "August 5, 2015 Ruling").  The August 5, 2015 Ruling on motions by ANR and TURN was against Edison.  Edison was ordered to file retroactive disclosure notices regarding *ex parte* communications between Edison and CPUC President Peevey from March 26, 2013 through June 17, 2014.

92.   Additionally, the August 5, 2015 Ruling provided a detailed list of ten (10) violations of Rule 8.4 which prohibits *ex parte* communications committed by Edison in the context of the SONGS OII, including:

> (a)   March 26, 2013 - Poland meeting: Pickett's statements that Peevey did all the talking about the possibility of settlement of the SONGS OII were not credible in light of other evidence.  In particular, the Judge found that Pickett admitted he disagreed with Peevey over treatment of replacement power costs and thus, engaged in a substantive communication with a decision maker which was not reported until nearly two years later, after a decision had been adopted.

> (b)   March 27, 2013: Pickett admitted he continued communication with Peevey the following night during dinner with others and wrote an internal e-mail that he was "working" SONGS at the dinner.  Pickett also admitted discussing possible settlement partners with Peevey.  Pickett's later statement that he did not recall discussing SONGS is less reliable than his contemporaneous internal e-mail.  Pickett's credibility is adversely impacted by his failure to disclose the true nature of the

March 26, 2013 meeting.  Thus, the Judge held that the evidence weighed in favor of concluding that Pickett communicated with Peevey on substantive issues relating to the potential allocation of some costs to be determined in the proceeding.

(c)     May 28, 2013: Les Starck, the Company's Senior Vice President of Regulatory Policy and Affairs, sent an e-mail to all five Commissioners with an SCE press release that provided SCE's response to U.S. Senator Boxer's allegations, made in reliance on two letters from SCE to Mitsubishi, the generators' manufacturer, from 2004 and 2005, that the NRC and SCE made errors related to the design of the steam generators.  Although Phase 3 had not yet begun, the Preliminary Scope in the initial OII and the Phase 1 scoping memo clearly indicated that the prudency of SCE's actions related to the generators' design were likely to be a factor in determining whether the SGRP costs, including for post shutdown repairs, were reasonable.  The press release includes substantive and argumentative content about SCE's actions and constituted a substantive communication to be determined in the SONGS OII.

(d)     May 29, 2013: Michael Hoover, the Company's Senior Director of State Energy Regulation, talked to Carol Brown, Peevey's Chief of Staff, and reported to Starck that she told him Pickett was "well prepared in Poland with specifics," but complained that "nothing has happened."  The Judge did not believe this to be a non-substantive "one-way" discussion.  The press release which prompted the communication was substantive, the topic upon which Pickett was "well-prepared" was much more likely to be possible settlement terms because the status report on the restart request was mostly limited to NRC's regulatory process, i.e., not "specifics" or something that SCE could make "happen."

(e)     June 26, 2013: Litzinger gave Commissioner Florio a "brief" update on the status of bargaining efforts regarding employee severance after announcement of the permanent shutdown of SONGS.  The question of SCE's employee compensation commitments and cost recovery of employee severance costs were substantive topics because their reasonableness would be considered by the Commission when reviewing 2013 SONGS Operations and Maintenance expenses.

(f)     September 6, 2013: Lunch meeting with Peevey, Litzinger and "the Chino Hills team" during which they discussed, inter alia, delaying any decision on SCE's 2012 ERRA proceeding regarding replacement power costs until a settlement was adopted in the SONGS OII.  Starck's internal e-mail to Pickett states that Litzinger offered his view in opposition to Peevey's approach by which SCE would get either replacement power costs or its capital investment but discussion of possible outcomes of SCE's cost recovery claims for replacement power and capital investment at SONGS.  Notably, at least one person at SCE advised Starck to check with Hoover about whether to report the "potential *ex parte* communication," to which Hoover replied that Starck "should not put this in his notes."  These latter e-mails also suggest that some SCE personnel were not committed to full disclosure of *ex parte* communications.

(g)     November 15, 2013: Craver had a dinner meeting with Peevey where he discussed efforts to bring Mitsubishi to the negotiating table regarding SCE's warranty claim, and efforts to gain written support from federal officials.  Some aspects of SCE's litigation of its claims against Mitsubishi is within the Preliminary Scope of "ratemaking issues related to warranty coverage…of SONGS costs.["] The diligence of SCE's actions to pursue alternate sources of funds to cover shutdown-related costs were relevant to the reasonableness of its actions after shutdown and funds recovered from Mitsubishi would be considered by the Commission to offset cost allocations to ratepayers in a later phase.  Therefore, the communication was substantive because it concerned matters to be determined in the OII and of interest to other parties.

(f)     May 28, 2014: Hoover met with Peevey who said he "talked to you and Ron about [the Greenhouse Gas Initiative] and was not pleased that SCE was hesitant to contribute funds to the Center for Sustainable Communities at UCLA as part of the SONGS settlement."  Peevey asked Hoover to tell SCE he would hate to see the tight schedule for the settlement slip, but no evidence that Hoover responded substantively.  SCE's disclosures and the e-mail support that an unreported communication occurred between Litzinger and Peevey in which the substantive issue of a possible settlement provision to address greenhouse gas impacts was discussed.  However, the evidence does not support that the communication between Hoover and Peevey was substantive.

(g)     June 11, 2014: Peevey called Hoover to his office to discuss the greenhouse gas issue, asked Hoover to deliver his letter to Litzinger which had several letters attached.  The letters were written to the Commission by several public officials urging the Commission to support greenhouse gas research.  Hoover transmitted the materials to Litzinger.  The evidence is that "Peevey talked with Ron last week" and then lowered the requested annual research amount to $3 million.  It is more credible that such a discussion was two-way because a significant change occurred in the parameters of a disputed issue related to the settlement of the OII.  The public officials' letters may also have been unreported *ex parte* communications but are not at issue as to SCE.

(h)     June 17, 2014: Peevey met with Craver about the greenhouse gas issue but Craver states he responded that he could not engage with Peevey on that topic.  Although characterized by SCE as "one-way," the evidence indicates that it was more likely two-way and substantive.  The e-mail states, "Ted just came and got Peevey" and the meeting was "about UCLA."  This is a substantive topic to be determined in the OII and other parties might seek to contest the issue.

93.     The August 5, 2015 Ruling also gave Edison until August 20, 2015 to show cause why it should not be held in contempt and sanctioned for its flagrant disregard for CPUC's rules for *ex parte* communication disclosure, and made clear

that "[t]he primary catalyst for review of [SCE's] alleged unreported communications was SCE's very late-filed, post-decision disclosure…."

94.     On August 11, 2015, ORA filed a petition requesting the CPUC to "overturn its decision adopting the [SONGS] settlement and reopen the SONGS investigation to all for resolution through litigation rather than through settlement." ORA states, in pertinent part, that:

> ORA was extraordinarily troubled by the revelations of *ex parte* communication violations and, in fact, filed its own motion to bar any future *ex parte* communications by any parties for any purpose in the proceeding. ORA believed then, as it does now, that the appropriate way to address the massive and pervasive violations is to extract sufficient financial concessions (not limited to penalties that would inure to the State of California) that would remove any conceivable benefit Edison might have achieved as a result of the unlawful communications.  ORA believes that the additional appropriate amount that should flow from Edison to ratepayers should be at least $648 million, the difference between the settlement amount and ORA's initial litigation position prior to the state of settlement negotiations.

> ORA therefore determined that it would not join the effort to reject the settlement, but rather reluctantly honor its commitment to support the settlement.  However, circumstances have since changed and ORA now takes the position that ratepayers and the public generally are better served by allowing ORA, TURN, A4NR and other consumer groups to work towards a litigated outcome for all issues in the SONGS investigation docket.  Based on the August 5, 2014 ALJ Amended Ruling, it does not appear possible that ORA can achieve the amount of reimbursement it believes would compensate ratepayers for Edison's unlawful activities that undermined the SONGS settlement negotiations.

95.     On October 29, 2015, the ALJ proposed a penalty of $16.7 million against Edison for its *ex parte* communications, affirming its prior ruling that Edison was guilty of multiple violations of Rule 8.4, and finding Edison guilty of two Rule 1.1 ethical violations.

96.

### *Edison's Stock Price Collapse*

97.     At the start of the Class Period, Edison's stock price was trading at approximately $49 per share.  As a result of the materially false and misleading

statements and omissions as set forth above, Edison's common stock grew to over $66 per share and traded at artificially inflated prices during the Class Period.

98.    The substantial appreciation in Edison's stock price was due to the announcement of the SONGS Settlement and expectations that Edison was putting the costs and expenses of this liability behind them.

99.    When the truth began to emerge about Edison's *ex parte* communications, that the SONGS Settlement was jeopardized and that Edison's exposure could be greater, the Company's stock price corrected as the artificial inflation dissipated:

- On February 9, 2015, after Edison's first disclosure of its *ex parte* communications, its stock price fell to $62.78 per share from over $66.33 per share, then continued to correct as the truth emerged over the next few months.

- On April 29, 2015, on news of Edison's additional *ex parte* communications, shares of Edison fell from $61.13 per share to $60.08.

- On May 4, 2015, on news of the additional *ex parte* communications, shares of Edison declined $2.87 per share over two days of trading, or roughly 3.75%, to close at $59.60 on May 6, 2015.

- On June 24, 2015, on news of TURN's application charging SCO with "fraud by concealment," shares of Edison declined $1.56 per share or over 2.70%, to close at $56.07 on June 24, 2015.

100.    Plan participants who invested in the Stock Fund during the Class Period purchased Edison stock at inflated prices; they also held Edison stock while forgoing other, prudent investment alternatives in reliance on the stock price and public news about Edison. When Edison's stock price fell from as the result of the public's reaction to the news, and factored into a new stock price as the artificial inflation of the price dissipated, the Plan participants, such as plaintiff and the other members of the class, were significantly damaged as a result.  Defendants, who were

1  the fiduciaries tasked with protecting plaintiff and the class from such harm, are

2  directly responsible for these damages.

3              V.     THE FIDUCIARY BREACHES

4        101.   Throughout the Class Period, defendants knew or should have known

5  that Edison had not disclosed to the public the truth about the existence and volume

6  of its *ex parte* communications with the CPUC relating to the SONGS Settlement,

7  and their potential impact on the SONGS Settlement.  Defendants knew or should

8  have known that Edison made materially false and misleading statements to the

9  public the SONGS Settlement, and that it had manipulated and exploited CPUC

10  process through various violations of rules prohibiting and requiring prompt

11  disclosure of all *ex parte* communications.  Defendants knew or should have known

12  that Edison's stock price was artificially inflated by its non-disclosures, and false

13  and misleading disclosures to the public, and that these made the Company Stock

14  Fund an imprudent investment.

15        102.   Defendants, who are Edison, its CEO, and its Treasurer, knew or were

16  well-positioned to know of the Stock Fund's imprudence during the Class Period.

17  Each had inside knowledge at Edison and access to its internal records, and knew or

18  had reason to know the truth about the Company's *ex parte* communications.  The

19  Company's internal emails and documents produced by Edison demonstrate that its

20  officers knew of the *ex parte* communications.

21        103.   Defendant Craver was directly involved in, and was fully aware of,

22  Edison's improper *ex parte* communications.  Craver knew that these *ex parte*

23  communications violated CPUC rules and needed to be disclosed by law (but were

24  not), knew that Edison was attempting to manipulate the settlement process in its

25  favor (and that he was a direct part of that effort), and knew that the publicly

26  reported status of the SONGS Settlement was false.

27        104.   Defendant Boada, Edison's Vice President and Treasurer, is and was a

28  member of the Trust Investment Committee.  Upon information and belief, Boada

1   knew at the time they occurred and were concealed of the *ex parte* communications

2   over negotiations of the SONGS Settlement.  According to internal documents

3   released by Edison, Boada was a party to weekly emails and internal conferences

4   with updates on the SONGS Settlement, which included details on the *ex parte*

5   communications between Edison officers and CPUC employees.  These

6   communications included details about the negotiations over the UC donation for

7   annual research on greenhouse gasses, which appears to have been a personal *quid*

8   *pro quo*.  He knew or should have known that these *ex parte* communications were

9   illegal and violated Edison policy – and that their concealment from the public had

10  artificially inflated Edison's stock price, making the Stock Fund an imprudent

11  investment for Plan participants.

12      105.  Defendant Edison was involved in and aware of the improper *ex parte*

13  communications its senior officers engaged in and concealed from the public on its

14  behalf.

15      106.  Notwithstanding this knowledge, these Plan fiduciaries did nothing to

16  act upon that knowledge to protect the retirement savings of the Plan participants to

17  whom they owed their fiduciary duties.

18      107.  First, Defendants had the power to disclose the truth to the public and

19  to correct the artificial stock price inflation, inasmuch as it was the false public

20  disclosures that had artificially inflated the stock price.  Defendants could have

21  stopped those misrepresentations from ever happening, or corrected them much

22  earlier than they were ultimately corrected, which would have prevented all or some

23  of the artificial inflation, and lessened the ultimate correction.  Either way, Plan

24  participants' losses would have been mitigated, if not altogether prevented.

25      108.  Defendants cannot justify their disclosure failures by "hiding behind"

26  the securities laws.  In this situation, CPUC Rules required Edison's disclosure of

27  the *ex parte* communications, and Company was penalized for failing to so.

28  Additionally ERISA and the securities laws compelled defendants to take exactly

the same action – tell the truth and correct the inflated stock price.  No law or duty required defendants to *prevent* the disclosure of the truth – quite the opposite.

109.   Second, defendant Boada, as a member of the Trust Investment Committee, had the power to prevent Plan participants from buying Edison at inflated prices by suspending or closing the Stock Fund to new investments or instructing the Trustee to temporarily suspend it.

110.   Third, defendants Edison had the power to amend the Plan to suspend or cease the Stock Fund as an investment option until such time as the Stock Fund was no longer an imprudent investment.  Edison could have thereby prevented Plan participants from buying at inflated prices.

111.   Fourth, defendant CEO Craver was responsible for appointing and monitoring the fiduciaries on the Trust Investment Committee and the Benefits Committee.  He had the duty to ensure that these Plan fiduciaries knew all material information about Edison so that they could properly fulfill their duties as fiduciaries.  He also had the power to appoint Plan fiduciaries who knew of the undisclosed material facts concerning the SONGS Settlement, so that Edison stock received proper review for prudence and compliance with ERISA as an investment option.  Defendant Boada likewise had a duty to disclose what he knew to his co-fiduciaries so that they could properly perform their fiduciary duties.

112.   Critically, all of these powers remained available to defendants to exercise whether or not some or all of their fiduciary duties were delegated to others.

113.   These actions would not have caused more harm than good.  Simply preventing new purchases would not have constituted insider trading.  If defendants needed to disclose the fact of the freeze to the public, such a disclosure (a) would not have been prohibited by the securities laws and (b) might actually have encouraged Edison's making of a fulsome disclosure to the public about the state of the SONGS Settlement, its *ex parte* communications and the potential risks.

114.   In sum, defendants, who were the fiduciaries of the Plan, breached their fiduciary obligations to Plan participants.  They allowed those to whom they owed the "highest duties under law" to purchase and hold Company stock at an artificially high price during the Class Period, knowing that damaging material information was not factored into the stock price or disclosed to the public.  No matter what happens to its stock price in the future – even if it recovered all of its losses – the Plan participants would still be injured because they were deprived of retirement money that otherwise would have rightfully been theirs from overpaying for the stock.

115.   And Plan participants who simply held Edison's shares during the Class Period were injured as well, because they were prohibited from being able to invest in an alternative, prudent investment that would not have caused them the same losses during the Class Period.

116.   Millions upon millions of dollars were lost from the retirement accounts of Edison employees. Defendants, as Plan fiduciaries, are directly responsible for this enormous harm that their breaches of duty caused.

## VI.    CLASS ACTION ALLEGATIONS

117.   Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(l) and/or (b)(2) on behalf of herself and the following class of persons similarly situated (the "Class"):

> All individuals, excluding defendants, who participated in the Plan and whose individual accounts purchased and/or held the Edison Company Stock Fund at any time between March 27, 2014 and June 24, 2015, inclusive.

118.   Excluded from the Class are defendants, other officers and directors of the Company, members of defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

119.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff

at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are at least 20,720 members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Edison or the Plan and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

120.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

121.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     Whether defendants each owed a fiduciary duty to the Plan, to plaintiff and to members of the Class;

b.     Whether defendants breached fiduciary duties owed to the Plan, plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

c.     Whether defendants violated ERISA; and

d.     The extent to which Class members have sustained damages and the proper measure of those damages.

122.   Plaintiff's claims are typical of the claims of the members of the Class because plaintiffs and the other members of the Class each sustained damages or were negatively affected by defendants' wrongful conduct in violation of ERISA as complained of herein.

123.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

124.   Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is also brought on behalf of the Plan, and any prosecution of separate actions by the members of the Class would create a risk of

1   adjudications with respect to the Plan which would, as a practical matter, be

2   dispositive of the interests of the other members not parties to the actions, or

3   substantially impair or impede their ability to protect their interests.

4         125.   Class action status is also warranted under the other subsections of Rule

5   23(b) because: (i) prosecution of separate actions by the members of the Class

6   would create a risk of establishing incompatible standards of conduct for

7   defendants; (ii) defendants have acted or refused to act on grounds generally

8   applicable to the Class, thereby making appropriate final injunctive, declaratory or

9   other appropriate equitable relief with respect to the Class as a whole.

10         126.   Plaintiff also brings this action on behalf of the Plan pursuant to ERISA

11   §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2).

12   **COUNT I**<br>**(Failure to Prudently and Loyally Manage the Plan's Assets - Against All**

13   **Defendants)**

14

15         127.   Plaintiff incorporates the allegations contained in the previous

16   paragraphs of this Complaint as if fully set forth herein.

17         128.   At all relevant times, as alleged above, all defendants were fiduciaries

18   within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they

19   exercised discretionary authority or control over the administration and/or

20   management of the Plan or disposition of the Plan's assets.

21         129.   Under ERISA, fiduciaries who exercise discretionary authority or

22   control over management of a plan or disposition of a plan's assets are responsible

23   for ensuring that investment options made available to participants under a plan are

24   prudent. Furthermore, such fiduciaries are responsible for ensuring that all

25   investments in the Company's stock in the Plan were prudent and that such

26   investment was consistent with the purpose of the Plan.  Defendants are liable for

27   losses incurred as a result of such investments being imprudent.

28

130.   A fiduciary's duty of prudence require it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  RISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

131.   Defendants breached their duties to prudently manage the Plan's assets. During the Class Period, defendants knew that the Stock Fund had become an imprudent investment for Plan participants' retirement savings because Edison had engaged in *ex parte* communications which potentially voided the SONGS Settlement, and by misrepresenting and withholding material disclosure about the status of the SONGS Settlement from the Plan participants and the public about the stock that had artificially inflated its value.

132.   Accordingly, defendants should have taken appropriate responsive action by restricting transactions or new investments by the Plan in the Stock Fund or by effectuating disclosures that would have corrected the stock price and rendered the Stock Fund a prudent investment again.

133.   As such, between March 27, 2014 and October 29, 2015, Plan participants could not appreciate the true risks presented by investments in Edison's stock and, therefore, could not make informed decisions regarding their investments.

134.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## COUNT II
### (Failure to Provide the Plan Fiduciaries with Accurate Information - Against All Defendants)

135.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

136.   At all relevant times, as alleged above, defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

137.   At all relevant times, as alleged above, the scope of the fiduciary responsibility of defendants included the responsibility to appoint, evaluate, and monitor other Plan fiduciaries, including, but not limited to, any person or persons to whom certain fiduciary responsibilities were at least partially delegated.

138.   Defendants' fiduciary duty entailed ensuring that these other Plan fiduciaries each had truthful and accurate information to fulfill their respective jobs and duties as fiduciaries and to properly monitor, evaluate and oversee the Plan's investment in the Stock Fund.

139.   Under ERISA, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

140.   Defendants breached their fiduciary monitoring duties during the Class Period by failing to provide the public, and their co-fiduciaries and their fiduciary delegates, with truthful and accurate information concerning Edison's *ex parte* communications and the potential for these to void the announced SONGS Settlement, and the prudence of Edison stock as an appropriate retirement investment.

141.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and other Plan participants, suffered

foreseeable damage to and/or lost a significant portion of their retirement investments.

142.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for:

1.     Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing plaintiff as class representative, and determining that plaintiff's counsel satisfies the prerequisites of Rule 23(g);

2.     Declaration that defendants breached ERISA fiduciary duties owed to the Plan and its participants;

3.     An Order compelling defendants to make good to the Plan all losses to the Plan resulting from defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if defendants had fulfilled their fiduciary obligations;

4.     Imposition of a Constructive Trust on any amounts by which defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

5.     An Order enjoining defendants from any further violations of their ERISA fiduciary obligations;

6.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses including the lost opportunity costs;

7.     An Order that defendants allocate the Plan's recovery to the accounts of all participants who had any portion of their account balances invested in the Company Stock Fund in proportion to the accounts' losses attributable to the decline in the price of its common stock and/or the value of investment in alternative options under the Plan;

8.     Awarding the Plan and/or Plan participants rescission and/or money damages including pre-judgment interest;

9.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

10.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

11.    An Order for equitable restitution and other appropriate equitable monetary relief against defendants; and

12.    Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

By:   _/s/ Michael L. Kirby_

Michael L. Kirby
Ryan S. Kirby
**KIRBY NOONAN LANCE & HOGE LLP**
350 Tenth Avenue, Suite 1300
San Diego, CA 92101-8700
Telephone:  619/231-8666
Facsimile:   619/231-9593
_MKirby@knlh.com_

Samuel E. Bonderoff
Jacob H. Zamansky
Edward H. Glenn Jr.
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
_samuel@zamansky.com_

ATTORNEYS FOR PLAINTIFF